FLORIDA DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, a Department of the State of Florida, Plaintiff,

v.

Joseph A. CALIFANO, Jr., Individually and as Secretary of the Department of Health, Education and Welfare (HEW), an Agency of the United States Government, Defendant.

No. TCA 77–0772.

United States District Court,
N. D. Florida,
Tallahassee Division.

March 28, 1978.

Stephen Nall and Charles L. Carlton, Gen. Counsel, Florida Dept. of H & R Services, Tallahassee, Fla., for plaintiff.

Clinton Ashmore, Asst. U. S. Atty., Tallahassee, Fla., and Carl H. Harper, Regional Atty., Dept. of Health, Education & Welfare, Atlanta, Ga., for defendant.

Edward A. McDermott, Anthony S. Harrington, Allen R. Snyder, Hogan & Hartson, Washington, D. C., John W. Costigan, Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, Fla., for intervenors National Rehabilitation Association.

## MEMORANDUM OPINION

STAFFORD, District Judge.

This is an action for a declaratory judgment to determine the rights and duties of the parties under the Rehabilitation Act, 29 U.S.C. § 701, et seq., § 204 of the Intergovernmental Cooperation Act of 1968 (IGCA), 42 U.S.C. § 4214, and § 6(c) of the Joint Funding Simplification Act of 1974 (JFSA), 42 U.S.C. § 4255(c). In addition, plaintiff seeks review of a final administrative order rendered by the Commissioner of the Rehabilitation Services Administration (RSA) under authority delegated him by the Secretary of the United States Department of Health, Education and Welfare (HEW). Federal question jurisdiction is properly founded upon 28 U.S.C. §§ 1331 and 2201 and 29 U.S.C. § 721(d).

The plaintiff, Florida Department of Health and Rehabilitative Services (HRS or Florida), is the executive department of the State of Florida charged with the duty of administering the program of vocational rehabilitation services for the handicapped within the State of Florida. Defendant Joseph A. Califano is the Secretary of HEW, the federal agency responsible, through its sub-agency RSA, for administering the grant-in-aid program established pursuant to the Rehabilitation Act, 29 U.S.C. § 720, et seq. The National Rehabilitation Association, Inc. (NRA), a national organization with an interest in the provision of rehabilitative services to handicapped persons, has been granted leave to intervene as a party defendant.

Subchapter I of the Rehabilitation Act authorizes federal grants to the states to assist them in meeting the costs of providing vocational rehabilitation services for the handicapped. 29 U.S.C. § 720. While participation by a state in the federal grant program is wholly voluntary, those states which elect to receive federal funds must in each fiscal year submit an annual vocational rehabilitation plan to the Secretary meeting certain requirements set forth in 29 U.S.C. § 721. There are nineteen distinct requirements that must each be satisfied.

Only the first two of these mandatory requirements are pertinent to the instant lawsuit. First, the state must "designate a State agency as the sole State agency to administer the plan, or to supervise its administration by a local agency . . . ." 29 U.S.C. § 721(a)(1)(A). It is further provided that the sole State agency in charge of administering the plan be one of three types:

(i) a State agency primarily concerned with vocational rehabilitation, or vocational and other rehabilitation, of handicapped individuals, (ii) the State agency administering or supervising the administration of education or vocational education in the State, or (iii) a State agency which includes at least two other major organizational units each of which admin-

isters one or more of the major public education, public health, public welfare, or labor programs of the State . . . .

29 U.S.C. § 721(a)(1)(B).

Second, if the designated state agency is of the second or third category enumerated in section 721(a)(1)(B), as is HRS, it must include a vocational rehabilitation bureau, division, or other organizational unit which (i) is primarily concerned with vocational rehabilitation, or vocational and other rehabilitation, of handicapped individuals, and is responsible for the vocational rehabilitation program of such State agency, (ii) has a full-time director, and (iii) has a staff employed on such rehabilitation work of such organizational unit all or substantially all of whom are employed full time on such work. . .

Section 721(b) of Title 29 mandates that the Secretary shall approve any annual state plan abiding by the nineteen conditions specified in subsection (a), and disapprove any plan failing to fulfill the stated conditions. This authority to approve or disapprove state vocational rehabilitation plans has been delegated by the Secretary to the Commissioner of RSA. 40 Fed.Reg. 5809 (Feb. 7, 1975). Prior to disapproving a state's plan, the Commissioner is required to notify the state of his intent to disapprove and to give the state reasonable notice and an opportunity for a hearing. 29 U.S.C. § 721(b).

The present controversy arose when the Legislature of the State of Florida enacted legislation in 1975 reorganizing the internal structure of HRS, the designated sole state agency in Florida for the administration of vocational rehabilitation services. Chapter 75–48, Laws of Florida 1975, Florida Statutes § 20.19. This reorganization was incorporated into Florida's proposed Vocational Rehabilitation State Plan for Fiscal Year 1976 (Plan), which was submitted to RSA on January 30, 1976. On March 15, 1976, the Commissioner of RSA notified Florida of his intent to disapprove the Plan. In the Commissioner's view the Plan failed to adhere to the conditions of the Rehabili-

tation Act and HEW regulations promulgated thereunder because it did not satisfy the organizational unit requirement of 29 U.S.C. § 721(a)(2).

A hearing on Florida's Plan was convened August 2 and 3, 1976, and October 6, 1976. The hearing officer who presided at the hearing issued a recommended decision on November 26, 1976, concluding that the Plan did not comport with the provisions of 29 U.S.C. § 721(a)(2) and implementing regulations, 45 C.F.R. Part 1361. The hearing officer made the following specific findings:

(1) That the proposed Florida Plan for Vocational Rehabilitation for Fiscal Year 1976 does not provide for a full time director of the organizational unit responsible for vocational rehabilitation in Florida;

(2) That the designated director of the vocational rehabilitation organizational unit, the Program Director, lacks adequate authority and responsibility in the following areas;

(a) vocational rehabilitation services at the district and/or field level,

(b) vocational rehabilitation personnel that deliver the vocational rehabilitation services at the district and/or field level,

(c) in the interpretation and execution of plans, policies, procedures, and guidelines with respect to vocational rehabilitation programs at the District and/or field level,

(d) in the ability to take prompt corrective action for departures from established plans, policies, procedures, and guidelines of vocational rehabilitation at the district and/or field level,

(e) in the supervision of the district officials of the Florida Department of Health and Rehabilitative Services in charge of vocational rehabilitation programs and services at the district and/or field level, and

(f) over district vocational rehabilitation budgets and district cooperative agreements relating to district vocational rehabilitation activities.

(3) That the proposed Florida Plan for Fiscal Year 1976 fails to provide for clear lines of authority over vocational rehabilitation in Florida since the structure of the Florida Department of Health and Rehabilitative Services requires a shared or joint responsibility of the organizational unit by the Program Director and the district administrators with the latter officials responsible to the authority of the Assistant Secretary for Operations of the Department.

Record, Ex. 75, pp. 34–35.[1]

Florida filed exceptions to the recommended findings and conclusions, and the parties thereafter appeared before the Commissioner of RSA to present their opposing views regarding the recommendations. On January 19, 1977, the Commissioner issued an order adopting the hearing officer's proposed findings and decision and disapproving the Florida Plan. He ordered that grants to Florida under the Act be discontinued after March 31, 1977.

On January 30, 1977, Florida Governor Reubin Askew wrote to Secretary Califano requesting a waiver of the section 721(a)(2) organizational unit requirement. The request relied upon § 204 of the Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4214, and § 6(c) of the Joint Funding Simplification Act of 1974, 42 U.S.C. § 4255(c), as the basis for the Secretary's authority to grant such a waiver. Section 4214 of Title 42 authorizes the head of an agency having responsibility over a grant-in-aid program to waive a statutory provision requiring a state to designate a single state agency to administer the program.[2] Similarly, 42 U.S.C. § 4255(c) allows waiver of "a single or specific public agency" requirement.[3]

Secretary Califano responded to Governor Askew's letter on March 24, 1977, stating that they had no authority under either IGCA or JFSA to grant the requested waiver. In the Secretary's opinion both Acts allowed waiver only of single or specific state agency requirements of grant-in-aid legislation, such as is contained in 29 U.S.C. § 721(a)(1)(A), but not of the organizational unit requirement found in 29 U.S.C. § 721(a)(2).

Florida instituted the present action on March 25, 1977. An administrative stay of the fund cutoff order pending a decision by this court was sought by Florida and granted by the Commissioner of RSA. Consequently, Florida has continued to receive federal vocational rehabilitation grant funding during the pendency of this lawsuit.

---

1. All citations in this opinion to the administrative record shall be by reference to the relevant exhibit and page numbers.

2. 42 U.S.C. § 4214 provides:
 Notwithstanding any other Federal law which provides that a single State agency or multimember board or commission must be established or designated to administer or supervise the administration of any grant-in-aid program, the head of any Federal department or agency administering such program may, upon request of the Governor or other appropriate executive or legislative authority of the State responsible for determining or revising the organizational structure of State government, waive the single State agency or multimember board or commission provision upon adequate showing that such provision prevents the establishment of the most effective and efficient organizational arrangements within the State government and approve other State administrative structure or arrangements: Provided, That the head of the Federal department or agency determines that the objectives of the Federal statute authorizing the grant-in-aid program will not be endangered by the use of such other State structure or arrangements.

3. 42 U.S.C. § 4255(c) provides:
 In promoting the more effective and efficient use of Federal assistance resources, Federal agency heads may waive requirements that a single or specific public agency be utilized or designed to receive, supervise, or otherwise administer a part of the Federal assistance drawn upon by any jointly funded project to the extent that administration by another public agency is determined to be fully consistent with applicable State or local law and with the objectives of the Federal assistance program involved. This authority may be exercised only (1) upon request of the head of a unit of general government, with respect to agencies that he certifies to be under his jurisdiction, or (2) with the agreement of the several State or local public agencies concerned.

Currently before the court are the following motions: (1) Florida's motions for summary judgment on Count I of the complaint and for partial summary judgment on Count II; (2) the cross-motions of the Secretary and NRA for judgment on the pleadings or for summary judgment as to all matters raised in the pleadings; (3) Florida's motion for trial de novo and to permit discovery; (4) Florida's motion for consideration of supplemental material. The defendants have affirmatively indicated no objection to the last motion, and it shall be granted.

The remaining motions raise the following issues, which shall be discussed individually below: (1) whether the provisions of IGCA and JFSA permit the Secretary to waive the organizational unit requirement of 29 U.S.C. § 721(a)(2); whether the administrative decision below was predicated upon application of an erroneous standard of law; (3) whether HEW's decision was based upon an internal program instruction that should have been promulgated as a rule; whether the organizational unit requirement of 29 U.S.C. § 721, imposed as a condition upon Florida's receipt of federal vocational rehabilitation funds, constitutes a violation of Article IV, § 4, and Amendment X of the United States Constitution; and (5) whether Florida is entitled to further discovery and a trial de novo on the question whether extraneous political pressure influenced HEW's decision. Having considered the various motions and the memoranda of counsel, the court decides all the above issues in favor of defendants. There being no genuinely disputed issues of material fact, summary judgment for defendants is appropriate.

Florida's primary contention in this case is that, contrary to the Commissioner's ruling, both IGCA and JFSA authorize waiver of the Rehabilitation Act's organizational unit requirement. Although the pertinent provisions of IGCA and JFSA speak only in terms of allowing waiver of single state agency requirements, Florida takes the position that the organizational unit requirement of the Rehabilitation Act is subsumed within the single state agency requirement, and authority to waive the latter necessarily carries with it authority to waive the former.

Since a literal reading of the cited statutes does not support its argument, Florida places heavy reliance upon the legislative history of IGCA and JFSA. As Florida correctly notes, passage of IGCA was generated in part by concern that requiring designation of a single state agency to administer programs supported by federal grant-in-aid funds often hindered the states in their efforts to restructure state government and coordinate administration so as to facilitate the most efficient delivery of needed services. Greater organizational flexibility at the state level was thought to be essential.[4]

Similarly, JFSA was motivated by the realization that federal grant programs tended to focus on narrow program categories and denied the states the ability to deal with social needs in a comprehensive, rather than a piecemeal, fragmented, or duplicative manner. The single state agency requirements contained in several grant-in-aid statutes [5] were perceived as particular obstacles to the integrated provision of social services. Permitting waiver of such requirements would, in the view of witnesses who supported passage of JFSA, eliminate much of the unnecessary organizational rigidity that had been imposed upon state governments and stimulate experimentation by the states in the delivery of necessary social services.[6]

---

4. *See* hearings on H.R. 16718 and Related Bills Before the Subcommittee on Intergovernmental Relations, Committee on Governmental Operations, 90th Cong., 2d Sess., 87, 116, 121, 148–49 (1968).

5. *See, e. g.,* 42 U.S.C. § 602(a)(3) (Aid to Families with Dependent Children); 42 U.S.C.

§ 705(a)(2) (Maternal and Child Health); 20 U.S.C. § 1263(a)(2) (Vocational Education).

6. *See* Hearings Before the Intergovernmental Relations Subcommittee of the House of Representatives Committee on Government Operations, 93d Cong., 2d Sess., 1–2, 217, 267 (1974).

Florida reasons from the expansive statements of congressional policy contained in the legislative history that IGCA and JFSA were designed primarily to ease federal constraints on state organization of its agencies and programs. ˙ Consequently, it is claimed, the waiver provisions of those Acts should be construed broadly to encompass waiver of the 29 U.S.C. § 721(a)(2) organizational unit requirement.

Florida's contention that IGCA and JFSA were designed, at least in part, to ease excessively rigid state government organizational requirements is essentially correct, as is corroborated by the legislative history of the two Acts. It may also be, as Florida emphatically argues, that the 1976 Plan embodies very nearly the kind of laudable experimentation sought to be encouraged by Congress. It is beyond question, however, that Congress never intended by enactment of IGCA and JFSA to permit waiver of the organizational unit requirement of 29 U.S.C. § 721(a)(2). A literal reading of the relevant provisions strongly militates against such an interpretation of the legislative intent. IGCA speaks only of authority to waive "a single State agency or multi-member board or commission" requirement. 42 U.S.C. § 4214. To like effect is JFSA, which contemplates waiver of "single or specific public agency" requirements. 42 U.S.C. § 4255(c). Neither Act refers to an organizational unit requirement such as is contained in § 721(a)(2).

Moreover, the structure of the Rehabilitation Act itself casts serious doubt upon the validity of Florida's claim that the organizational unit requirement should be viewed as being subsumed within the single state agency requirement. Section 721(a) of Title 29 delineates nineteen conditions, each of which must be individually satisfied before a state vocational rehabilitation plan may be approved by HEW. The two specific requirements at issue in this case are found in separate provisions of Section 721(a); thus, the face of the statute provides no inkling that the two provisions are so intimately connected that authority to

waive one must of necessity suggest authority to waive the other.

Additionally, the purposes of the single state agency requirement and the organizational unit requirement, as gleaned from the legislative history of the Rehabilitation Act, are entirely different, raising the likelihood that Congress would not have intended to tacitly permit waiver of the latter at the same time that it authorized waiver of the former. The single state agency requirement is designed to guarantee that HEW will have one and only one state agency to hold accountable for administering and supervising the state vocational rehabilitation plan.[7] This requirement has been a component of the Rehabilitation Act for over three decades. Amendments to the Act in 1943 included the provision that a state plan shall "designate the state board of vocational education as the sole agency for the administration, supervision and control of the State plan." P.L. 113, § 2(a)(1), 78th Cong., 1st Sess. (1943). In 1954 the Act was again amended to broaden the categories of state agencies that could be designated under a state plan, including "the State agency administering or supervising the administration of vocational rehabilitation in the State, or a State rehabilitation agency (primarily concerned with vocational rehabilitation) . . . ." P.L. 565, § 5(a)(2), 83d Cong., 2d Sess. (1954). Amendments in 1965 changed the Act to read as it does presently. P.L. 89–333, § 8(a)(1) & (2).

It was also in 1965 that Congress first added the separate condition that where the single state agency is of the type envisioned by 29 U.S.C. § 721(a)(1)(B)(ii) & (iii), it must contain an organizational unit "primarily concerned with vocational rehabilitation, or vocational and other rehabilitation." The purpose of this condition, which is quite distinct from that of the single state agency requirement, is to prevent the state vocational rehabilitation unit and the program it administers from becoming submerged within other programs

---

7. *See* S.Rep. No. 1456, 90th Cong., 2d Sess., 16 (1968).

administered by the state agency.[8] Congress was concerned that there be clear lines of authority and responsibility within the state agency over the provision of rehabilitative services, and that administration of the program be the province of persons concerned almost exclusively with vocational rehabilitation and not with other social service programs. The congressional intent that the state rehabilitation unit maintain its organizational identity is embodied in the statute by the requirement of a full-time director for the unit and a staff which must devote most or all its time to vocational rehabilitation work. 29 U.S.C. § 721(a)(2).

■ Given the divergent purposes of the single state agency and organizational unit requirements, it is wholly inappropriate to apply the same treatment to both under IGCA and JFSA. The only reading that may properly be given the waiver provisions of IGCA and JFSA in this context is that which appears plainly upon the face of those statutes; that is, they authorize waiver only of the single state agency condition, not the organizational unit condition.[9]

■ The second point upon which Florida challenges the administrative ruling below is the contention that the decision was predicated upon the application of an erroneous standard of law. The scope of this court's review of the agency decision is bounded by the Administrative Procedure Act, which provides in pertinent part:

To the extent necessary to decision and when presented, the viewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . . . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

5 U.S.C. § 706. As stated in *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 207, 67 S.Ct. 1575, 1582, 91 L.Ed. 1995 (1947), the court's "duty is at an end when it becomes evident that the [agency's] action is based upon substantial evidence and is consistent with the authority granted by Congress."

Florida contests HEW's conclusion that "the Federal Act not only requires the VR organizational unit to be responsible for the state VR program, but it also requires that the director of the unit have authority and responsibility to control the functions and activities of the unit." Record, Ex. 75, p. 25. In plaintiff's view, this conclusion does not square with the language of 29 U.S.C. § 721(a)(2), which declares that the organizational unit shall be "responsible for the [state's] vocational rehabilitation program," but which does not set forth specifically the duties or authority to be possessed by the director of the unit. In particular, Florida seizes upon isolated language in the hearing officer's recommended decision to the effect that "the primary objection to the Florida Plan is the absence of an *unqualified authority* by the Program Director over the field VR personnel." Record, Ex. 75, p. 23 (emphasis added). Florida takes the position that the Vocational Rehabilitation Act does not require the director of the rehabilitation unit to have more than generalized authority over the program, and certainly

**8.** *See* H.R.Rep. No. 432, 89th Cong., 1st Sess., 13–14 (1965); Hearings on S. 1525 Before the Subcommittee on Health of the Senate Committee on Labor and Public Welfare, 89th Cong., 1st Sess. 42–43 (1965).

**9.** A subsidiary issue between the parties is whether JFSA permits waiver only of adminis-

trative, but not of statutory, requirements. The court's ruling that 42 U.S.C. § 4255(c) does not contemplate waiver of the organizational unit requirement (even if waiver of statutory requirements is permitted) renders decision of this question unnecessary.

does not require that he possess "unqualified authority" over the program and the personnel in the field. Thus, the argument goes, HEW applied an erroneous standard of law in making its ruling, and the Florida Plan, which gives direct authority over implementation of the program not to the director of the rehabilitation unit, but to district administrators who are also in charge of supervising other social service programs, is in full conformity with the Act.

Had the administrative decision below rested upon application of a standard of "unqualified authority" as the test of compliance with § 721(a)(2), this court would agree that the ruling was in error. It is manifest from a review of the decision of the Commissioner of RSA and the findings of the hearing officer, however, that this was not the legal standard applied. The hearing officer found that Florida's Vocational Rehabilitation Plan for 1976 "does not provide for a full time director of the organizational unit responsible for vocational rehabilitation in Florida." Record, Ex. 75, p. 34. Specifically, it was concluded that the designated director of the organizational unit "lacks adequate authority and responsibility" over personnel and the delivery of vocational rehabilitation services at both the district and field levels. *Id.* The authority of the director over the program was also found to be deficient in several other respects. *Id.* at 34–35.

■ Despite the hearing officer's doubtlessly inadvertent use at one point of the phrase "unqualified authority," the administrative decision below rests not on whether the unit director's authority was total and without qualification, but on whether it was adequate to fulfill the directives of § 721(a)(2). This was the correct legal standard. Necessarily implicit in the statutory requirement that the organizational unit have responsibility for the vocational rehabilitation program is a require-

ment that the director of the unit have substantial authority over the functioning of the program. Without providing substantial authority for the director over the entire operation of the program, Florida's Plan cannot comply with the intent of Congress that the program not become submerged within the other social service programs administered by the state. The diffusion of program authority that is effected by giving the district administrators primary responsibility over the provision of services is precisely the situation Congress sought to avoid.[10] Consequently, HEW's decision to disapprove the Plan was correct.

■ Florida's third major contention requires little discussion. Florida alleges that HEW's decision should be overturned because it relied in part upon an interpretative memorandum that ought to have been promulgated as a rule in accordance with the rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. At issue is RSA Program Instruction 75–31, which contains an agency interpretation of those portions of the Rehabilitation Act relevant to the organizational unit requirement, and a listing of those functions of the unit director deemed essential to carry out the legislative intent of the Act. HEW specifically relied upon this interpretative memorandum to some extent in disapproving Florida's Plan. *See* Record, Ex. 75, p. 16.

Having reviewed RSA Program Instruction 75–31, this court is of the view that it constitutes mere interpretation, which is exempted from the rulemaking provisions of the APA. 5 U.S.C. § 553. It does not deviate from the policies established by Congress in the Rehabilitation Act and by HEW in its formally promulgated regulations, nor does it create any new burdens upon those affected by its provisions or make any drastic changes in existing law. *See Continental Oil Co. v. Burns,* 317 F.Supp. 194 (D.Del.1970). Consequently,

10. The congressional intent is further fleshed out by HEW regulations detailing the requirements a state plan must meet to satisfy the organizational unit requirement. 45 C.F.R. Part 1361. The decision and findings below were fully in accord with these regulations, and Florida has not challenged their validity.

HEW did not err in issuing the memorandum without formal promulgation under the APA or in relying upon the memorandum in making the decision presently under review.

For its fourth point of contention Florida asserts that the Rehabilitation Act, to the extent it conditions receipt of federal grant monies on the adoption by a state of a particular governmental structure, constitutes an invalid encroachment upon the powers and prerogatives of the states in derogation of Article IV, § 4,[11] and Amendment X of the United States Constitution.[12] This contention relies heavily, if not exclusively, upon the Supreme Court's ruling in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). That decision held that extension of the minimum wage and maximum hours provisions of the Fair Labor Standards Act to employees of the states and their political subdivisions violated the Tenth Amendment. The majority opinion noted that "the Act displaces state policies regarding the manner in which they will structure delivery of those governmental services which their citizens require." *Id.* at 847, 96 S.Ct. at 2472.

The defendants respond that *National League of Cities* is inapposite to the facts and issues in the case at bar, and that consequently Florida's reliance on that decision is misplaced. They point to other federal decisions, most of them prior to *National League of Cities*, which establish that Congress has the power to fix conditions upon receipt by the states of federal grant funds, even though the legislation may to some degree intrude upon areas traditionally left to the discretion of the states under the Tenth Amendment. In *Oklahoma v. United States Civil Service Commission*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), the Supreme Court upheld a provision of the Hatch Act authorizing termination of grant-in-aid funds to any state which fails to discharge a state employee involved in partisan political activities. Mr. Justice Reed, writing for the court, reasoned:

> While the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, *it does have power to fix the terms upon which its money allotment to states shall be disbursed.*
>
> The Tenth Amendment does not forbid the exercise of this power in the way that Congress has proceeded in this case. As pointed out in *United States v. Darby*, 312 U.S. 100, 124, 61 S.Ct. 451, 85 L.Ed. 609, the Tenth Amendment has been consistently construed "as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end."

*Id.* at 143, 67 S.Ct. at 553 (emphasis added). The *Oklahoma* case has been consistently followed by the lower federal courts in determining that Congress has the authority to attach conditions upon monetary grants to the states, in spite of countervailing considerations of the Tenth Amendment. *Florida v. Mathews*, 526 F.2d 319 (5th Cir. 1976); *Arizona State Dep't. of Public Welfare v. Department of Health, Education, and Welfare*, 449 F.2d 456 (9th Cir. 1971); *Dupler v. City of Portland*, 421 F.Supp. 1314 (D.Me.1976).

The contentions advanced by the parties necessitate harmonizing *National League of Cities* with *Oklahoma* and its progeny. This task is not a difficult one for this court to discharge. The Supreme Court stated its essential holding in *National League of Cities* as follows:

**11.** Art. IV, § 4, of the United States Constitution provides:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

**12.** The Tenth Amendment states:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

This exercise of congressional authority does not comport with the federal system of government embodied in the Constitution. We hold that insofar as the challenged amendments operate to *directly displace* the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. I, § 8, cl. 3 [the commerce clause].

*Id.*, 426 U.S. at 852, 96 S.Ct. at 2474 (emphasis added). As seen from the above quotation, the narrow holding in *National League of Cities* is restricted to disapproval of congressional enactments that "directly displace" the power of the states to organize their own governments as they see fit. This rationale has no application to a case like the present one where the federal intrusion is wholly indirect and limited to measures meant to insure the proper functioning of federally funded programs.[13]

Moreover, the Supreme Court declined in *National League of Cities* to express any "view as to whether different results might obtain if Congress seeks to affect integral operations of state government by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment." *Id.* at 852 n. 17, 96 S.Ct. at 2474. Federally imposed restraints on state and local government activities which accompany federal grants to the states have in fact long been regarded as unobjectionable exercises of Congress' constitutional spending power. As the Court of Appeals for this Circuit held in *Florida v. Mathews, supra*:

> Likewise appellants' Tenth Amendment objections are without merit. Congress and the Secretary have not attempted to establish a federal licensing board in an attempt to prevent the states from regulating nursing home administrators. Instead, the statute and regulation merely establish terms and conditions under

which federal assistance will be provided to states that elect to participate in the nursing home component of the medicaid program. The only effect of the statute and regulation is to induce, but not require, a state to license its nursing home administrators in a specified manner; this inducement does not infringe upon any power reserved to the state under the Tenth Amendment.

> . . . . .

> Once a state chooses to participate in a federally funded program, it must comply with federal standards.

526 F.2d at 326. *See also Dupler v. City of Portland, supra.*

The conclusion that the requirements of 29 U.S.C. § 721(a)(2) are within the proper scope of the congressional spending power and are not constrained by the Tenth Amendment is further fortified by the purely voluntary nature of the requirements. Congress, through the Rehabilitation Act, has extended substantial grants-in-aid to the states as an inducement for their participating in a shared program providing vocational rehabilitation services to the handicapped. This inducement carries with it certain conditions Congress deems essential to the functioning of the program; however, any state which objects to the "strings" attached to receipt of the federal funds has the option to refuse both the grants-in-aid and the objectionable conditions. The Act does not impose a set of coercive, mandatory requirements such as were involved in *National League of Cities*. The remarks of the district court in *Dupler, supra*, are amply persuasive:

> In addition, the operation and practical effect of the federal statute is very different here than in *National League of Cities*. Unlike the FLSA amendments, which the states had no choice but to obey, the requirements of the Federal Food Stamp Act are not mandatory, but

---

**13.** The dissenting opinion of three Justices in *National League of Cities* provides additional support for this court's reading of that decision. Apparently it was the understanding of the dissenters that the majority did not intend

to rule out Congress' ability to condition receipt of grants-in-aid on compliance with federally imposed restrictions on state government. 426 U.S. at 880, 96 S.Ct. 2465 (Brennan, J., dissenting).

are impressed on state and local governments only as a condition of participation in the food stamp program. The decision whether to participate is voluntary with the states. . . . Since there is no requirement that a state participate, there is no coercion and thus no possible interference with state sovereignty. See *Steward Machine Co. v. Davis*, 301 U.S. 548, 586–90, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

421 F.Supp. at 1320–21 n. 8.

Accordingly, it is the opinion of this court, and the court so holds, that the conditions imposed upon the states pursuant to 29 U.S.C. § 721(a)(2) prior to their eligibility for federal grant funds under the Rehabilitation Act do not offend either the Tenth Amendment or the guarantee of a republican form of government for the states contained in Art. IV, § 4 of the United States Constitution.

 Florida has also moved for a trial de novo in this court plus further discovery on the issue, initially raised in the administrative proceedings below, of whether improper political pressure was applied to HEW during the time Florida's Plan was under review. *See D. C. Federation of Civic Associations v. Volpe*, 140 U.S.App.D.C. 162, 459 F.2d 1231 (1972); *Texas Medical Association v. Mathews*, 408 F.Supp. 303 (W.D.Tex.1976). Florida places special emphasis upon a letter from Congressman John Brademas, Chairman of the House Subcommittee on Select Education, to then-Secretary of HEW David Mathews dated October 7, 1975. In this letter Congressman Brademas expressed his concern and the Committee's belief that the Florida Plan was not in conformity with the Rehabilitation Act and the expressed intent of Congress in passing the Act. Florida contends that this letter provides evidence of extraneous political pressure sufficient to warrant this court's undertaking the extraordinary procedure of re-opening discovery and conducting a judicial trial de novo to determine whether improper congressional influence affected HEW's decision.

Despite its strenuous efforts, Florida has shown no reason why this court should make further inquiry into this matter. The primary reason why Florida's motion should be denied is that a trial de novo is precluded by the applicable provision of the Administrative Procedure Act, 5 U.S.C. § 706, which limits judicial review of agency proceedings to review of the administrative record. *United States v. Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

Further, the record below demonstrates that Florida had an ample opportunity to conduct discovery on this issue and to present all available evidence during the administrative hearing. Extensive use of interrogatories and depositions of HEW and NRA officials evidently uncovered scant intimations of unwarranted influence, for there is nothing in this record to suggest that political considerations actually tainted the decision below. Florida's motion merely seeks a repetitive round of discovery and another hearing on matters already fully presented at the administrative level.

 As far as the Brademas letter is concerned, this single item of correspondence raises no inference of impropriety. In *Federation of Civic Associations v. Volpe* and *Texas Medical Association v. Mathews*, *supra*, the extrinsic pressure that was alleged to have affected the agency action consisted of coercion of the most virulent kind—threats of loss of agency funding or of the job of the agency official charged with making the decision. The Brademas letter, which is the only arguable indication of political influence found by Florida as a result of extensive discovery, is of a much different character. It contains no threats of adverse action against HEW or its officials. On the contrary, it merely expresses Congressman Brademas' concern that HEW might grant the waiver desired by Florida, an action which he believed would be contrary to the legislative intent.

Moreover, the letter was not directed to the Commissioner of RSA, who had actual responsibility for approving or disapproving the Florida Plan, but to the Secretary, who

at the time had before him only Florida's request for a waiver of the organizational unit requirement pursuant to IGCA or JFSA. The letter has no relation to the final decision under review here, particularly since Florida has adduced no proof that the Commissioner was aware of, or influenced by, contact between the Secretary and Congressman Brademas. In fact, HEW has produced internal memoranda and affidavits signed by Andrew S. Adams, then-Commissioner of RSA, and Frederick Sachs, Assistant Commissioner for Program Management of RSA, which tend to substantiate that no improper influence affected the Commissioner's decision. Florida has not attempted to rebut this documentary evidence.

. Florida having failed to support its claim relating to possible extraneous political influence, there is no cause for this court to grant the motion for trial de novo and further discovery.

Having reviewed the administrative record, and having considered the motions and the memoranda of counsel, it is the opinion of this court that the decision of the Commissioner of RSA disapproving Florida's Vocational Rehabilitation Plan for Fiscal Year 1976 is not in error under the applicable law and regulations. Consequently, defendants' motions for summary judgment should be granted, and the administrative ruling under review should be upheld.

### ORDER

In accordance with the foregoing memorandum opinion, it is ORDERED AND ADJUDGED that:

1. Florida's motion for consideration of supplemental material be, and the same hereby is GRANTED.

2. Florida's motion for summary judgment on Count I of the complaint and motion for partial summary judgment on Count II of the complaint be, and the same hereby are, DENIED.

3. Florida's motion for trial de novo and to permit discovery be, and the same hereby is, DENIED.

4. The motions of HEW and NRA for summary judgment be, and the same hereby are, GRANTED. Judgment shall be entered in favor of defendants declaring that the administrative decision below is affirmed in all material respects.