Brenda CRAWFORD, etc., et al.,
Plaintiffs-Appellants,

v.

Edwin L. PITTMAN, et al.,
Defendants-Appellees.

No. 82–4222.

United States Court of Appeals,
Fifth Circuit.

July 8, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 31, 1983.

---

Barry H. Powell, Dennis L. Horn, Hazelhurst, Miss., for plaintiffs-appellants.

Larry M. Wilson, Sp. Asst. Atty. Gen., Jackson, Miss., for Pittman, Allain and Holladay.

Robertshaw & Merideth, James Robertshaw, Greenville, Miss., for Western Line.

Mitchell, Eskridge, Voge, Clayton & Beasley, Jeremy J. Eskridge, Tupelo, Miss., for Tupelo Municipal Separate School Dist.

Campbell & Delong, L. Carl Hagwood, Greenville, Miss., for Thomas Bogue.

Before RUBIN and TATE, Circuit Judges, and W. EUGENE DAVIS *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

The issue is whether employees of a state that receives federal funds under the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1400–1420 (1976 & Supp. V 1981) (the Act), may refuse, in formulating individual educational programs (IEPs) for children within their school system, to consider the possible necessity for programs extending beyond 180 days per year. Reversing the district court, we hold that such a policy violates the Act's mandate that an individual educational program be designed to meet the personal needs of each handicapped child. The Act requires the state to treat each child as an individual, a human whose unique qualities and needs can be evaluated and served only by a plan designed with wisdom, care and educational expertise. Its grand design does not tolerate policies that impose a rigid pattern on the education of children. Each IEP must be prepared on the basis of an individual

evaluation of a particular boy or girl. The child and his or her parents and guardians can exact no more. The state must provide no less.

The named plaintiffs are six handicapped children from Mississippi and their parents. The record reflects their progress through the 1980 school year. Three of the plaintiffs, Scott and Matthew Ramey and Joey Colavolpe, attended the McDougal Center, a special school for handicapped children located in Tupelo, Mississippi. The Rameys and Colavolpe each have autistic-like handicaps. The Ramey children each exhibit self-stimulating, interfering behavior such as toe-walking and hand-flapping. They have reached only about one-half the development expected in a child of equal age. Matthew also suffers from deficient language and socialization skills.

Joey Colavolpe has also achieved approximately one-half the development expected for a child of his age. When he first entered the McDougal Center, his verbal communications were limited to the repetition of television commercials. He has made significant progress while at the Center.

The IEPs prepared for these children did not call for full-year instruction. Until 1980, however, the McDougal Center operated on a year-round basis with funds provided by Title XX of the Social Security Act, 42 U.S.C. §§ 1397–1397f (1976). The Center's Education Director deposed that it was then simply assumed that the children would receive twelve months' education per year. The IEPs, therefore, were structured around short-term goals. Once a child reached the immediate goals of his IEP, a new one was prepared. In 1980, Title XX funds became unavailable to the McDougal Center, and it began to receive its funding through the Mississippi Department of Education. Beginning in that year, therefore, the Center followed the state policy of limiting IEPs to nine-month programs.

The other three children named as plaintiffs attended a residential program at the Brown School in San Marcus, Texas. Kenana, sitting by designation.

* District Judge of the Western District of Louisi-

neth Woods suffers from "organic brain syndrome." Although he is fourteen years old, he functions at the level of a five-year-old. His "self-help" skills are approximately those of a three-year-old. He is occasionally violent and aggressive.

In early 1979, Kenneth attended the Riverside Elementary School in Avon, Mississippi. His teacher prepared a memorandum stating: "[Kenneth] needs a program designed for him that would cover all his waking hours. He does not need the numerous breaks of a public school nor three months off in the summer." Kenneth was admitted to the Brown School in October 1979. The record does not contain any IEP prepared for Kenneth by the Brown School. It does, however, contain a "clinical summary" and a "school report" prepared by Brown. These documents are like an IEP in that they set goals for Kenneth and outline an educational program for him. The record also contains monthly progress reports prepared by Brown. None of these documents, however, addresses Kenneth's need for a full-year educational program.

Katherine Austin is an 18-year-old who also suffers from "organic brain syndrome." Her intellectual function is in the low-average range. She suffers from auditory hallucinations, fantasies and daydreams. She has been attending Brown and her school record contains documents similar to those in Kenneth Wood's file. They do not address her need for a special education program extending beyond 180 days.

Dewey McClendon is a fourteen-year-old suffering from dyslexia and "organic brain syndrome." He functions at about one-half normal development, and sometimes throws "fits." The documents in his Brown School file do not address his need for a full-year educational program.[1]

Mississippi, like every state except New Mexico, receives federal funds under the Act. Plaintiffs filed this class action challenging the State's refusal to provide handicapped children special education programs extending beyond 180 days a year. All of the defendants except the Hazlehurst Municipal School District admitted in answering the complaint that they: (1) provide only 180 days of special education to handicapped children; (2) instruct their employees not to include special education programs of longer duration on any child's IEP; and (3) would not provide such education even to a child whose IEP called for it. Hazlehurst also admitted the first two facts, but denied that it would not provide such a program to a child whose IEP called for it.

The district court certified a class of "all mentally and emotionally handicapped children in Mississippi who receive, or will in the future receive, special education and related services pursuant to the Education for All Handicapped Children Act, 20 U.S.C. § 1401 et seq., and the Rehabilitation Act, 20 U.S.C. § 794 et seq."[2] The class thus includes children suffering from handicaps that range from relatively minor to severe and profound.

The plaintiffs contend that handicapped children "regress" seriously during periods when they are without educational programs. The plaintiffs argue that, therefore, these children may lose during the summer much, if not all, of what they

---

1. A seventh child was named as plaintiff when this suit was filed. Brenda Crawford, a severely and profoundly retarded child, would today be sixteen years old. She was not toilet trained and had not yet learned to speak. She did not have the use of her arms or legs. An IEP prepared for Brenda by the Willowood Development Center states: "It is felt this student should participate in a twelve-month program. A twelve-month program should help eliminate (prevent) any regression that will probably result from not being involved in a structured program." A later IEP prepared for Brenda by the North Elementary School, however, did not provide for full-year education. Brenda died on March 2, 1982.

2. The district judge certified an all-inclusive class because, when the suit was filed, the plaintiffs claimed the Act required the states to provide each handicapped child such educational services as necessary to maximize self-sufficiency. In light of the intervening decision in *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the plaintiffs' claims are now more limited.

learned during the school year. Moreover, the plaintiffs contend, the regression suffered by handicapped children is substantially more severe than that suffered by nonhandicapped children. The defendants agree that handicapped children regress, but do not agree that the regression is as severe as claimed by the plaintiffs.

## I.

The Act provides federal funds to assist state and local agencies in the education of handicapped children. It was passed in response to Congress' perception that most of the nation's handicapped children "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.' " [3] The Act conditions funding on state compliance with prescribed goals and procedures.

To qualify for funds under the Act, each state must submit to the Commissioner of Education a plan outlining how the funds will be used.[4] The plan must demonstrate that the state "has in effect a policy that assures all handicapped children the right to a free appropriate public education." [5]

The Act imposes educational priorities on the states that choose to accept its federal funds. Their state plans must demonstrate that they will provide education first "to handicapped children who are not receiving an education," then to children with "the most severe handicaps who are receiving an inadequate education." [6]

The "free appropriate public education" that the states must provide each handicapped child includes "educational instruction specially designed to meet the unique needs of each handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." [7] It must be tailored to fit the unique needs of the children through the preparation of an "individualized educational program" (IEP) for each child.[8]

The IEP is prepared at a meeting between a representative of the local educational agency, the child's teacher, the parent or guardian and, when appropriate, the child. It consists of a written document containing:

(A) a statement of the present levels of educational performance of the child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.[9]

Local or regional educational agencies must review, and, when appropriate, revise, each child's IEP at least annually.[10]

The Act provides extensive procedural safeguards to ensure that its guarantee of appropriate education is realized. The state or local educational agency must allow parents or guardians to examine all relevant records pertaining to the education of their child.[11] If the parents desire an independent educational evaluation of the child, the agency must allow them to obtain one.[12]

The state or local educational agency must notify parents or guardians of handicapped children of any proposed change in "the

---

3. *Id.* at ——, 102 S.Ct. at 3037, 73 L.Ed.2d at 695 (quoting H.R.Rep. No. 94–332, p. 2 (1975)).

4. 20 U.S.C. § 1413 (1976).

5. *Id.* § 1412(1).

6. *Id.* § 1412(3).

7. *Rowley,* —— U.S. at ——, 102 S.Ct. at 3041, 73 L.Ed.2d at 700.

8. 20 U.S.C. §§ 1401(18), 1414(a)(5).

9. *Id.* § 1401(19).

10. *Id.* §§ 1413(a)(11), 1414(a)(5).

11. *Id.* § 1415(b)(1)(A).

12. *Id.*

identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child."[13] The parents or guardians of handicapped children must be permitted to bring a complaint concerning "any matter relating to" the child's evaluation or education.[14] These complaints must be considered at an "'impartial due process hearing."[15]

If the initial hearing is held at the local or regional level, the state must provide an appeal to the state educational agency.[16] Thereafter, "[a]ny party aggrieved by the findings and decision" of the state educational agency has "the right to bring a civil action with respect to the complaint . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."[17]

State compliance with the Act is assured by the provisions for judicial review. Moreover, the Commissioner is authorized to withhold federal funds from a state if he determines it has failed to comply with the Act.[18]

## II.

The district judge upheld Mississippi's refusal to provide more than 180 days of special education per year because he concluded that the Act governs only the kind and quality of services a state is required to provide to handicapped children. Questions concerning the extent or duration of those services, he ruled, were left exclusively to the states. This approach relies on a distinction neither intimated by the Act nor suggested by its legislative history. Moreover, it fails to give sufficient weight to the Act's procedural requirement that each handicapped child's needs be evaluated in formulating an individually-tailored IEP.

In *Board of Education v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court noted that Congress placed great reliance on the Act's procedures for formulating and reviewing each child's IEP. *Id.* at ——, 102 S.Ct. at 3050, 73 L.Ed.2d at 711. The court recognized a "legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Id.*

"[T]hese procedural safeguards require individual attention to the needs of each handicapped child."[19] Beginning with the formulation of each child's IEP, the Act requires the states to provide "specialized instruction and related services which are *individually designed* to provide educational benefit to the handicapped child."[20] This emphasis on individual consideration continues through the entire administrative appeals process specified by the Act.[21]

In *Battle v. Pennsylvania,* 629 F.2d 269, 280 (3d Cir.), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1980), the Third Circuit, considering a 180-day limit much like Mississippi's, held the "inflexibility of the defendants' policy of refusing to provide more than 180 days of education to be

---

**13.** *Id.* § 1415(b)(1)(C), (D).

**14.** *Id.* § 1415(b)(1)(E).

**15.** *Id.* § 1415(b)(2).

**16.** *Id.*

**17.** *Id.* § 1415(e)(2). The record does not show that the plaintiffs in this suit exhausted their administrative remedies before filing suit in federal district court. However, the state concedes that resort to those remedies would be futile because of the state's settled policy of refusing special education programs in excess of 180 days. When the administrative procedure would be futile, courts have not required exhaustion. *See Vander Malle v. Ambach,* 673

F.2d 49, 52 (2d Cir.1982); *Riley v. Ambach,* 668 F.2d 635, 640–41 (2d Cir.1981); *Monahan v. Nebraska,* 645 F.2d 592, 597 (8th Cir.1981).

**18.** 20 U.S.C. § 1416 (1976).

**19.** *Battle v. Pennsylvania,* 629 F.2d 269, 280 (3d Cir.), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1980).

**20.** *Rowley,* —— U.S. at ——, 102 S.Ct. at 3049, 73 L.Ed.2d at 709 (emphasis added; footnote omitted).

**21.** *Battle,* 629 F.2d at 280.

incompatible with the Act's emphasis on the individual." The court noted that the "180 day rule imposes with rigid certainty a program restriction which may be wholly inappropriate to the child's educational objectives." *Id.*[22]

The Supreme Court's decision in *Rowley* also recognized the Act's emphasis on individual consideration.[23] The decision, therefore, implicitly ratifies the Third Circuit's conclusion that categorical limitations on the possible duration of special education programs are simply inconsistent with the Act's insistence on IEPs formulated to meet the unique needs of each handicapped child.[24]

### III.

The invalidity of Mississippi's categorical 180-day limit on all special education programs is also demonstrated by the Act's substantive requirements, as explained in *Rowley*. The court in *Rowley* considered a demand for additional services for a deaf student who, pursuant to her IEP, attended regular school classes. The school was already furnishing the student with substantial special services. Her parents claimed,

however, that the school was also required to provide her with a qualified sign-language interpreter in class as part of her "appropriate public education."

The Court declined to "establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act."[25] Nevertheless, it did provide guidance as to the substantive limitations imposed by the Act. Dealing first with maximum goals, the court held that the Act contains no "requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other children.' "[26]

Although the Act does not require handicapped children to be given the means "to achieve strict equality of opportunity or services" neither does it permit the state to furnish "handicapped children with only such services as are available to nonhandicapped children."[27] Implicit in the term "appropriate education" is "the requirement that the education to which access is provided be sufficient to confer *some educational benefit* upon the handicapped child."[28] The

**22.** *Accord Georgia Ass'n of Retarded Citizens v. McDaniel,* 511 F.Supp. 1263 (N.D.Ga.1981), *appeal docketed,* No. 81–7485 (11th Cir. June 8, 1981); *Lee v. Clark,* No. 80–0418 (D.Hawaii Jan. 30, 1981); *Moore v. Roberts,* No. LR–C 81–419 (E.D.Ark. July 24, 1981). Another suit challenging a school district's refusal to provide summer education for handicapped children was settled shortly before the hearing on the merits. *See Hilden v. Evans,* No. 80–511–RE (D.Or. Nov. 5, 1980). The school district agreed to provide three and one-half hours of instruction, five days a week, for six weeks of the summer.

**23.** *See* —— U.S. at ——, 102 S.Ct. at 3048–49, 73 L.Ed.2d at 708–709.

**24.** Post-*Rowley,* the only courts to consider 180-day limitations like Mississippi's have invalidated them for essentially the reasons stated in *Battle. See Yaris v. Special School District,* 558 F.Supp. 545 (E.D.Mo.1983); *Phipps v. New Hanover County Bd. of Education,* 551 F.Supp. 732 (E.D.N.C.1982).

**25.** *Rowley,* —— U.S. at ——, 102 S.Ct. at 3049, 73 L.Ed.2d at 709.

**26.** *Id.* at ——, 102 S.Ct. at 3046, 73 L.Ed.2d at 706.

**27.** *Id.* at ——, 102 S.Ct. at 3047, 73 L.Ed.2d at 707.

**28.** *Id.* at ——, 102 S.Ct. at 3048, 73 L.Ed.2d at 708 (emphasis added). This substantive standard was anticipated by Judge Van Dusen, concurring in *Battle.* His opinion suggested that the class in that case should be narrowed to include only those handicapped children "whose regression-recoupment syndrome is so severe that the traditional summer vacation period occasioned by the 180-day policy brings their overall progress for the year to a virtual standstill." 629 F.2d at 282. *Accord Abrahamson v. Hershman,* 701 F.2d 223, 229 (1st Cir.1983) ("The only substantive limitations Congress placed on the states were the requirements that the policy chosen provide the handicapped child with some educational benefit ... and conform to the Act's mainstreaming requirements."). The Court did intimate in *Rowley* that an IEP providing "benefit" alone might not, in all circumstances, be adequate: "We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate education.' " —— U.S. at —— n. 25, 102 S.Ct. at 3049 n. 25, 73 L.Ed.2d at 710 n.

Court explained that "[i]t would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education."[29] The basic substantive standard under the Act, then, is that each IEP must be formulated to provide some educational benefit to the child.

■ When a state or local educational agency, because of funding limitations, places limits on the services that may be provided handicapped children, the manner in which the financial deficit is to be adjusted is indicated by the legislative history:

> If sufficient funds are not available to finance all of the services and programs that are needed and desirable in the system then the available funds must be expended equitably in such a manner that no child is excluded from a publicly supported education consistent with his needs and abilities to benefit therefrom. The inadequacies of [the school system] whether occasioned by insufficient funding or administrative inefficiency, certainly cannot be permitted to bear more heavily on the 'exceptional' or handicapped child than on the normal child.[30]

Lack of funds, therefore, may not limit the availability of "appropriate" educational services to handicapped children more severely than it does to normal or nonhandicapped children.[31]

Mississippi's policy of refusing categorically to consider special education programs that extend beyond 180 days prevents state education employees from determining which children, if any, require year-round education programs. It is impossible for the state, parents or courts to tell which children need such programs if they are to obtain even the simple "benefit" required by the Act. Moreover, insofar as the 180-day limit is based on funding considerations, the state cannot know whether the lack of funds has a more severe impact on handicapped than nonhandicapped children if it does not first adequately assess the real needs of its handicapped children.

■ We conclude that Mississippi's policy of refusing to consider or provide special education programs of a duration longer than 180 days is inconsistent with its obligations under the Act. Rigid rules like the 180-day limitation violate not only the Act's procedural command that each child receive individual consideration but also its substantive requirements that each child receive some benefit and that lack of funds not bear more heavily on handicapped than nonhandicapped children.[32]

## IV.

■ The Federal Non-Interference With Curriculum Statute, 20 U.S.C. § 1232a (1976)[33] does not undermine the Act's re-

---

25. To decide the case before us today, however, it is not necessary for us to speculate as to the circumstances, if any, in which more than "benefit" might be required.

29. *Rowley,* —— U.S. at ——, 102 S.Ct. at 3048, 73 L.Ed.2d at 708.

30. S.Rep. No. 168, 94th Cong., 1st Sess. 23, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1447. This quotation from the legislative history first appeared in *Mills v. Board of Educ.,* 348 F.Supp. 866, 876 (D.D.C.1972). It has frequently been quoted when efforts were made to explain the substantive requirements of the Act. *See Rowley,* —— U.S. at —— n. 15, 102 S.Ct. at 3044 n. 15, 73 L.Ed.2d at 704 n. 15.

31. Mississippi is not now parsimonious in its aid to the handicapped. In the 1979–80 school year, the state expended almost five dollars for the handicapped for every one dollar in federal

funding it received for that purpose. For the 1978–79 school year, the ratio was $7.30 to $1.00. We are not called upon to decide in this case all of the circumstances under which a state faced with legitimate funding limitations could reduce expenditures for its handicapped childrens' program or whether the cost of the benefits to a particular child are a factor to be considered in preparing the IEP.

32. Because we conclude that Mississippi's 180-day limit is inconsistent with the requirements of the Education for All Handicapped Children Act of 1975, we need not consider plaintiffs' alternative claim that the policy also violates Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976).

33. That statute provides:
> No provision of any applicable program shall be construed to authorize any department,

quirement that each handicapped child receive individualized consideration. In *Wheeler v. Barrera,* 417 U.S. 402, 416, 94 S.Ct. 2274, 2283, 41 L.Ed.2d 159, 172 (1974), *modified on another ground,* 422 U.S. 1004, 95 S.Ct. 2625, 45 L.Ed.2d 667 (1975), the Supreme Court noted that § 1232a was "directed primarily at the possibility of HEW's assuming the role of a national school board . . . ."

■ The Court noted that the statute could apply to a federal court's playing "an overly active role in supervising" a state's expenditures of federal funding under Title I of the Elementary and Secondary Education Act of 1965. *Id.* The Supreme Court also recognized, however, the federal courts' responsibility to "assure that state and local agencies fulfill their part of the Title I contract if they choose to accept Title I funds." *Id.* at 427, 94 S.Ct. at 2288, 41 L.Ed.2d at 178. In requiring that Mississippi furnish its handicapped children the individualized consideration required by the Act, we do not undertake an "overly active supervision" of how the state administers its education programs. Our decision requires only that Mississippi fulfill the contract it made when it chose to receive federal moneys under the Act. We, therefore, reject Mississippi's § 1232a argument.

In *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Supreme Court recognized that, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* at 17, 101 S.Ct. at 1540, 67 L.Ed.2d at 707 (footnote omitted). Mississippi argues that Congress failed unambiguously to require that states consider education programs extending beyond 180 days, and that, therefore, the Act does not require it.

In *Tatro v. Texas,* 703 F.2d 823 (5th Cir. 1983), we rejected the contention that, under *Pennhurst,* the Act was insufficiently clear to create obligations binding on the states. Our opinion explained: "[t]hat the [Act] creates enforceable rights to 'special education and related services' . . . was clearly established in [*Rowley*]." *Id.* at 826 n. 2. Today we hold that Mississippi's 180-day policy is contrary to that enforceable right. *Pennhurst* does not require a different conclusion.

Mississippi's final argument is that, if the Act creates a right to consideration of special education programs extending beyond 180 days, it is contrary to the tenth amendment.[34] In *National League of Cities v. Usery,* 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245, 257–258 (1976), the Supreme Court held that this amendment prevented Congress, acting pursuant to the commerce clause, from enacting legislation that operates to "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions . . . ."

■ The Act, however, was not an exercise of Congress' power to regulate commerce. It involves both Congress' power to legislate under the spending clause and to assure equal protection of the laws to all alike under section five of the fourteenth amendment.

■ As an attempt to "further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives," the Act fits the classic pattern of legislation enacted under the spending power.[35] Spending power legisla-

---

agency, officer, or employee of the United States to exercise any direction, supervision or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, or over the selection of library resources, textbooks or other printed or published instructional materials by any educational institution or school system, or to require the assignment or transportation of stu-

dents or teachers in order to overcome racial imbalance.

**34.** "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

**35.** *Fullilove v. Klutznick,* 448 U.S. 448, 474, 100 S.Ct. 2758, 2759, 2772, 65 L.Ed.2d 902, 921

tion is not subject to the restrictions of *National League of Cities.* The Court was concerned in that case with legislation that "directly displaced" state freedom to structure its traditional operations. "Conditioning the receipt of federal grants does not similarly impose a direct restriction on states' decisionmaking: they may choose to conform to federal requirements or to forego federal funds." [36]

[7] Like statutes enacted under the spending power, those Congress enacts pursuant to section five of the fourteenth amendment are not subject to the limita-

tions of *National League of Cities.*[37] As the Supreme Court recently explained, to uphold a statute as an exercise of Congress' legislative power under the fourteenth amendment, we must "be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection'...." [38] The legislative history of the Act indicates Congressional intent to rely on fourteenth amendment objectives and powers.[39]

(1980). The Supreme Court's decision in *Rowley* also suggests that the Act was an exercise of Congress's legislative power under the spending clause. *See* —— U.S. at ——, 102 S.Ct. at 3050 n. 26, 73 L.Ed.2d at 710 n. 26.

**36.** *Oklahoma v. Schweiker,* 655 F.2d 401, 412 (D.C.Cir.1981); *accord County of Los Angeles v. Marshall,* 631 F.2d 767, 769 (D.C.Cir.) (per curiam), *cert. denied,* 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980); *New Hampshire Dep't of Emp. Sec. v. Marshall,* 616 F.2d 240, 247 (1st Cir.), *appeal dismissed,* 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1980); *Walker Field Public Airport Auth. v. Adams,* 606 F.2d 290, 297 (10th Cir.1979); *North Carolina ex rel. Morrow v. Califano,* 445 F.Supp. 532, 536 & n. 10 (E.D.N.C.1977) (three-judge court), *aff'd mem.,* 435 U.S. 962, 98 S.Ct. 1597, 56 L.Ed.2d 54 (1978); *Florida Dep't of Health & Rehabilitative Serv. v. Califano,* 449 F.Supp. 274, 283–85 (N.D.Fla.), *aff'd mem.,* 585 F.2d 150 (5th Cir.1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979).

At least one commentator has argued that this distinction rests on a mistaken premise: "the only answer to the question '[c]an a state—or local government—afford to refuse a federal grant if it finds the rules and regulations accompanying that grant unreasonable?' is no ... The notion that state participation in national spending programs is voluntary is nothing more than a legal fiction ...." La Pierre, *The Political Safeguards of Federalism Redux: Intergovernmental Immunity and the States as Agents of the Nation,* 60 Wash.U.L.Q. 779, 882 (1982). Given New Mexico's refusal to participate in funding under this Act, we find the criticism inapposite.

**37.** *See EEOC v. Wyoming,* —— U.S. ——, —— n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18, 34 n. 18 (1983); *City of Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1562–63, 64 L.Ed.2d 119, 141 (1980).

**38.** *EEOC v. Wyoming,* —— U.S. at —— n. 18, 103 S.Ct. at 1064 n. 18, 75 L.Ed.2d at 34 n. 18.

**39.** The Act's findings of fact stated:

The Congress finds that—... it is in the national interest that the federal government assist state and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law.

20 U.S.C. § 1400(b)(9) (Supp. V 1981). In explaining the need for the legislation, the Senate Report explained:

This nation has long embraced a philosophy that the right to a free appropriate public education is basic to equal opportunity and is vital to secure the future and the prosperity of our people ... It is this Committee's belief that the Congress must take a more active role under its responsibility for equal protection of the laws to guarantee that handicapped children are provided equal educational opportunity.

S.Rep. No. 168, 94th Cong., 1st Sess. 9, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1425, 1433. Later, in explaining why the Committee rejected the notion that Congress should mandate only those services for which it provided full funding, the Senate Report stated:

The Committee recognizes the State's primary responsibility to uphold the Constitution of the United States ... as well as the Congress' own responsibility under the 14th Amendment to assure equal protection of the law.

*Id.* at 22, 1975 U.S.Code Cong. & Ad.News at 1446. Finally, we note the following passage from the Conference Report:

The Senate Bill and the House Amendments find it is in the national interest that the Federal Government assist state and local efforts to provide programs to meet the educational needs of handicapped children. The Senate Bill, not the House Amendments, states that it is in the national interest that the Federal Government assist state and local efforts in order to assure equal protection of the law. The House recedes.

■ Viewed as an exercise of Congress' legislative power under either the spending power or section five of the fourteenth amendment or both, therefore, the Act survives challenge under the tenth amendment and *National League of Cities.*

V.

We turn to the procedure on remand. The district judge shall enter an order declaring Mississippi's imposition of a 180-day limit on special education programs invalid. The court shall enter an order requiring that each child's IEP be individually designed pursuant to the procedural and substantive standards of the Act and this opinion.

Until the state has had the opportunity to formulate new IEPs, the district judge cannot evaluate which children, if any, will require extended programs under the substantive standards set forth in *Rowley.* The district court may, therefore, after hearing counsel, conclude that this class action has fulfilled its purpose. If so, he may terminate the class action with a final decree that incorporates a permanent injunction of a general nature and permits individual handicapped children or their parents to obtain further relief by pursuing the remedies provided by the Act.

For these reasons, the summary judgment in favor of the state is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

S.Conf.Rep. No. 455, 94th Cong., 1st Sess. 28–29, *reprinted in,* 1975 U.S.Code Cong. & Ad.News 1480, 1482.