# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-1721

_____

| | | |
|---|---|---|
| Little Rock School District, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| James Mauney, Mr. and Mrs., | * | |
| Parents of J.M., | * | Appeal from the United States |
| | * | District Court for the |
| Defendants. | * | Eastern District of Arkansas |
| | * | |

_____

| | | |
|---|---|---|
| James Mauney, Mr. and Mrs., | * | |
| Parents of J.M., | * | |
| | * | |
| Third Party Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| State of Arkansas, Arkansas | * | |
| Department of Education, | * | |
| | * | |
| Third Party Defendants-Appellants. | * | |

_____

Submitted: December 15, 1998

Filed: June 14, 1999

_____

Before FAGG, HEANEY, and WOLLMAN, Circuit Judges.

_____

HEANEY, Circuit Judge.

Appellees/defendants/cross-plaintiffs, Mr. and Mrs. James Mauney, frustrated with their inability to obtain an education for their severely physically disabled son, secured a due process hearing against the Little Rock School District (LRSD) under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491o (1998).[1] On February 3, 1997, a hearing officer found for the Mauneys and awarded compensatory education. The LRSD then initiated this action, claiming that the findings and award are not supported by the record. The Mauneys cross-claimed against appellants the State of Arkansas and its Department of Education (ADE), asserting claims under the IDEA and various other federal statutes. After the district court denied in part the state's and ADE's motion for summary judgment, they filed this interlocutory appeal.

The State of Arkansas and ADE make only one argument: that because Congress does not have the power under section 5 of the Fourteenth Amendment to pass legislation such as the IDEA, the purported abrogation of states' Eleventh Amendment immunity in § 1403 of that Act is ineffectual and therefore the state and the ADE are not proper parties to the suit. We conclude that Congress had both the power and intent to abrogate Eleventh Amendment immunity and therefore affirm the district court's determination that it has jurisdiction over the appellants.

_____

[1]The IDEA, originally passed in 1970 as the Education for the Handicapped Act (EHA), was amended as the Education for All Handicapped Children Act in 1975, and subsequently redesignated the IDEA in 1990.

## I. Statutory Scheme and Factual Background

The IDEA "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures." Board of Education v. Rowley, 458 U.S. 176, 179 (1982). In response to two federal district court decisions ruling that handicapped children should be afforded greater access to public education, Congress in 1974 undertook to provide federal funding in order to ensure "full educational opportunities to all handicapped children." Rowley, 458 U.S. at 180 (internal quotation marks and citation omitted); see also id. at 192 (providing history of the Act). The stated purpose of the Act is

> to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c). To that end, the IDEA confers upon disabled students the right to a public education and conditions federal financial assistance upon a recipient state's compliance with the substantive and procedural goals of the Act. See Honig v. Doe, 484 U.S. 305, 310 (1988). The chief mechanism for instituting the congressional purpose is the "free appropriate public education" (FAPE). A FAPE must be tailored to a child's unique needs and be implemented in an environment suitable for the child. See 20 U.S.C. §§ 1400(c), 1412(1), (2)(B), (3), and (5)(B) (1998). This requirement is satisfied where a state provides "personalized instruction with sufficient support services to permit the child to benefit educationally from that

instruction." Rowley, 458 U.S. at 203 (providing definition of sufficient services).

The IDEA also confers upon "[a]ny party aggrieved by the findings and decision [resulting from certain procedures available under § 1415(b) of the act] . . . the right to bring a civil action . . . in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e)(2). The LRSD initiated suit pursuant to § 1415(e)(2) and the Mauneys cross-claimed, alleging that appellants violated their son James' procedural rights under the IDEA "by failing to follow the procedural requirements of the IDEA . . . resulting in a denial of free appropriate public education for James." (Order at 2). In addition, the Mauneys claim that appellants denied James' procedural rights by "a) failing to provide trained personnel to meet the needs of children with James' disability; b) failing to enable [the Mauneys] to compel witnesses necessary to their case; and c) by failing to provide the appropriate continuum of placements necessary to meet the needs of a student with James' disabilities." (Order at 2). On the record before it, the district court granted appellants' motion for summary judgment as to claims a) and c), stating that the Mauneys failed to provide evidence suggesting that Arkansas and its Department of Education have failed to comply with statutory guidelines. As to the issue of compelling witnesses, the district court denied appellants' motion for summary judgment.

The IDEA grants parties to a hearing the right, inter alia, to compel the attendance of witnesses. See 20 U.S.C. § 1415(d)(2) (1998). Appellants did not provide any evidence suggesting that they are in compliance with that provision. Instead, they insist they are immune from suit under the Eleventh Amendment.

II. Discussion

A court ruling denying a claim of entitlement to immunity is immediately appealable. See Mitchell v. Forsyth, 472 U.S. 511, 524-25 (1985). This interlocutory appeal from denial of motion for summary judgment based on immunity is thus

appropriate as an exception to the final order requirement of 28 U.S.C. § 1291. We review the district court's denial of summary judgment de novo. See Burnham v. Ianni, 119 F.3d 668, 673 (8th Cir. 1997).

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Though the text of the Constitution appears to delimit only Article III diversity jurisdiction, the Supreme Court has construed this language to bar citizens from bringing suit against their own state in federal court. See Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238 (1985) (citing Hans v. Louisiana, 134 U.S. 1 (1890)).[2] The Court has justified its expansive reading of the Eleventh Amendment by reference to the dual principles of federalism and sovereign immunity. See id.; see also Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996) (stating that "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms") (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)).

The Supreme Court has also recognized two "well-established exceptions to the reach of the Eleventh Amendment." Atascadero, 473 U.S. at 238. First, a state may waive its immunity and thereby subject itself to suit in federal court. See id. Second, Congress may, when acting pursuant to its enforcement power under section 5 of the Fourteenth Amendment, abrogate Eleventh Amendment immunity without the states' consent. See Seminole Tribe, 517 U.S. at 59 ("[W]e recognize[] that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy [] fundamentally altered the balance of state and federal power struck by the

---

[2]Such immunity also extends to state agencies, such as the ADE, which are considered an "arm of the State." Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977).

Constitution.") (citing <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 455 (1976)). Arkansas and the ADE contend that neither exception applies in this case. We disagree.

<u>Seminole Tribe</u> established a two-part inquiry for identifying effective abrogation of states' Eleventh Amendment immunity from suit: first, whether Congress "unequivocally expresse[d] its intent to abrogate the immunity," 517 U.S. at 55 (quoting <u>Green v. Mansour</u>, 474 U.S. 64, 68 (1985)), and second, whether Congress acted "pursuant to a valid exercise of power." <u>Id.</u> (quoting <u>Green</u>, 474 U.S. at 68).

A. Intent to Abrogate

A court may not find congressional intent to abrogate state immunity absent "unmistakable language." <u>Atascadero</u>, 473 U.S. at 239-40. Congress' intent to abrogate state immunity is patent in the IDEA. Section 1403(a) of the Act was adopted by Congress in response to the Supreme Court's determination in <u>Dellmuth v. Muth</u>, 491 U.S. 223, 231 (1989), that the then-EHA did not contain an unequivocal declaration such as would support "with perfect confidence [the conclusion] that Congress in fact intended in 1975 to abrogate sovereign immunity." The amended Act provides that a "State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter." 20 U.S.C. § 1403(a) (1998); <u>see</u> <u>also</u> <u>Straube v. Florida Union Free Sch.</u>, 801 F. Supp. 1164, 1171 (S.D.N.Y. 1992) ("The IDEA abrogates the Eleventh Amendment for violations occurring in whole or in part after October 30, 1990."). The amended Act thus satisfies the first part of the <u>Seminole Tribe</u> test.

B.  Power to Abrogate

The second part of the <u>Seminole Tribe</u> test stems from the Court's determination that although Congress may not abrogate Eleventh Amendment immunity pursuant to its Commerce Clause power, <u>see</u> 517 U.S. at 66-67 (overturning <u>Pennsylvania v. Union Gas Co.</u>, 491 U.S. 1 (1989)), it may do so when exercising its enforcement power under section 5 of the Fourteenth Amendment, <u>see</u> <u>id.</u> at 59 (citing <u>Fitzpatrick v. Bitzer</u>, 427 U.S. 445, 452-56 (1976)).[3]  The narrow question in this case, then, is that begged by the holding in <u>Seminole Tribe</u>:  the extent of Congress' power to enact legislation under section 5 of the Fourteenth Amendment.[4]

_____

[3]In <u>Union Gas</u>, a plurality of the Court concluded that Congress may abrogate states' immunity from suit when legislating pursuant to the plenary powers granted it by Article I of the Constitution.  <u>See</u> 491 U.S. at 19.  Specifically, the Court ruled that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, was a proper exercise of Congress' power to create state government liability when legislating pursuant to the Commerce Clause.  <u>See id.</u>  In <u>Fitzpatrick</u>, the Court had reasoned that since the Fourteenth Amendment postdated the Eleventh Amendment and since it was specifically intended to limit state sovereignty, Congress could "provide for private suits against States or state officials" when it exercised legislative authority pursuant to section 5 of the Fourteenth Amendment.  427 U.S. at 456 (Rehnquist, J.) ("When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority.").  In rejecting the reasoning of <u>Union Gas</u>, the Court noted that <u>Fitzpatrick</u> cannot be read to justify "limitation of the principle embodied in the Eleventh Amendment through appeal to antecedent provisions of the Constitution."  517 U.S. at 66 (citation omitted).  At the same time, <u>Seminole Tribe</u> reaffirmed <u>Fitzpatrick</u>'s conclusion that the Fourteenth Amendment worked an alteration in the balance of power between federal and state sovereignty, thereby permitting Congress to unilaterally abrogate state immunity from suit.  <u>See</u> <u>id.</u> at 58-59.

[4] As an initial matter, it is clear from legislative intent and purpose that Congress intended to enact and amend the IDEA pursuant to its Fourteenth Amendment powers.  <u>See</u> <u>St. Louis Dev. & Disability Treatment Ctr. Parents Ass'n</u>

Appellants argue that the Supreme Court's recent decision in City of Boerne v. Flores, 117 S. Ct. 2157 (1997), severely restricted Congress' power to pass legislation under the Fourteenth Amendment. We do not share that view. We read City of Boerne to stand for the unexceptional proposition that Congress may not subvert the judiciary's interpretation of the substantive meaning of the Constitution and the judiciary may not abdicate to another branch its role as final arbiter of the substantive meaning of the Fourteenth Amendment.

In City of Boerne, the Supreme Court reiterated that Congress could not overrule the Court's decisions as to the substantive meaning of the Constitution. 117 S. Ct. at 2168 (citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). The City of Boerne decision stemmed from Congress' passage of the Religious Freedoms Reformation Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb-2000bb-4. RFRA was enacted by Congress in a patent attempt to overrule the Court's decision in Employment Div., Dep't of Human Servs. of Or. v. Smith, 494 U.S. 872, 887 (1990), that the Free Exercise Clause of the First Amendment does not require neutral laws of general applicability to be justified by a compelling government interest even when such laws significantly burden religious practices. See 117 S. Ct. at 2161-62 (quoting RFRA, 42 U.S.C. § 2000bb(b)) ("'The Act's stated purposes are: (1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed.2d 965 (1963), and Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526,

---

v. Mallory, 591 F. Supp. 1416, 1473-74 (W.D. Mo. 1984), aff'd, 767 F.2d 518 (8th Cir. 1985) (finding legislative intent to rely on Fourteenth Amendment); Counsel v. Dow, 849 F.2d 731, 737 (2nd Cir. 1988) (same). While Congress need not "anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection,'" in order to establish that it intended legislation to fall under its Fourteenth Amendment enforcement power, a court must "be able to discern some legislative purpose or factual predicate that supports the exercise of that power." EEOC v. Wyoming, 460 U.S. 226, 243 n.18 (1983) (citing Fullilove v. Klutznick, 448 U.S. 448, 476-78 (1980)). Both Houses of Congress stated that the EHA was designed to enforce equal protection. See Counsel, 849 F.2d at 737 & n.6 (citing S. Rep. No. 94-168, at 9 (1975), reprinted in 1975 U.S.S.C.A.N. 1425, 1433); Crawford v. Pittman, 708 F.2d 1028, 1037 n.39 (5th Cir. 1983) (citing legislative history)).

32 L. Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.'").

In order to understand the limited scope of the City of Boerne decision, it is necessary briefly to recount its historical antecedents. It is well established that section 5 of the Fourteenth Amendment "is a positive grant of legislative power" to enforce the provisions contained in section 1 of that Fourteenth Amendment. See 117 S. Ct. at 2163 (quoting Katzenbach v. Morgan, 384 U.S. 641, 651 (1966)).[5] The City of Boerne Supreme Court reemphasized the broad scope of Congress' section 5 power:

> "Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power."

Id. (quoting Ex parte Virginia, 100 U.S. 339, 345-46 (1879)). Relying on this same language, the Court in Morgan, 384 U.S. at 650, concluded that section 5 accorded Congress "the same broad powers expressed in the Necessary and Proper Clause." The well-known formulation for determining the scope of congressional power under the Necessary and Proper Clause holds: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist[ent] with the letter and spirit of the constitution, are constitutional." M'Culloch v. Maryland, 17 U.S. (4 Wheat)

_____

[5]Section 1 of the Fourteenth Amendment provides, in pertinent part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 5 grants Congress the "power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

316, 421 (1819). Citing the language in M'Culloch and Ex Parte Virginia, the Morgan Court held that legislation is "appropriate" under section 5 of the Fourteenth Amendment if it is "'plainly adapted'" to enforcing the Equal Protection Clause and "not prohibited by but is consistent with 'the letter and spirit of the constitution.'" 384 U.S. at 650-51 (quoting M'Culloch, 17 U.S. at 421).

Nonetheless, broad language contained in Morgan caused concern that the Congress' section 5 power was virtually unlimited and that such a ruling would undermine the foundational principles of Marbury v. Madison. Justice Harlan, in particular, worried that the decision conferred on Congress an unbridled, independent authority to determine the substantive meaning of Equal Protection. See Morgan, 384 U.S. at 668 (Harlan, J., dissenting) (expressing view that majority gave Congress "power to define the substantive scope of the [Fourteenth] Amendment"). This fear was allayed by Oregon v. Mitchell, 400 U.S. 112 (1970), in which seven justices "indicate[d] that § 5 does not confer unlimited power on Congress to determine the meaning of Equal Protection." 3 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 19.3 at 531 (2d ed. 1992) (discussing fragmented opinions in Oregon v. Mitchell). Though the various opinions in Oregon v. Mitchell failed to delineate the precise limits of congressional power under section 5, the Court's decision indicated that while Congress may independently arrive at the conclusion that particular state action constitutes invidious discrimination in violation of Equal Protection, even if the judiciary has yet to reach such a conclusion, that power does not permit Congress to alter the substance of Fourteenth Amendment rights as previously defined by the Supreme Court. See Oregon v. Mitchell, 400 U.S. at 295-96 (Stewart, J., concurring).

In City of Boerne, the Court definitively laid to rest fears of too broad congressional power. The Court rejected the so-called "ratchet" theory reading of Morgan, which maintained that Congress could expand (but not contract) the substantive rights created by section 1 of the Fourteenth Amendment, even where the Court had already explicitly rejected such rights. See 117 S. Ct. at 2168. At the same

time, the Court took pains to reaffirm the broad nature of congressional enforcement power under section 5: "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" 117 S. Ct. at 2163 (quoting Fitzpatrick, 427 U.S. at 455). In reinforcing the proper allocation of power between co-equal branches of government, the City of Boerne Court also provided much needed guidance for determining when Congress oversteps boundaries created by Separation of Powers principles.

Observing that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and [that] Congress must have wide latitude in determining where it lies," the Court instructed that "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." 117 S. Ct. at 2164. First, the Court examined RFRA for congruence, ultimately determining that there was no factual basis for supposing a widespread practice of unconstitutional conduct in violation of the Free Expression Clause and finding that the statute violated Separation of Powers principles. See id. at 2171-72. Second, the Court examined the statute for proportionality, concluding that RFRA was over-inclusive in its requirement that courts subject to strict scrutiny all state action alleged to violate free exercise of religion. An aspect of the Court's proportionality inquiry turned on the degree to which RFRA undermined principles of federalism. See id. Applying the congruence and proportionality analysis to the IDEA, we conclude that it does not exceed the scope of Congress' power under section 5.

1. Congruence

The "congruence" prong of City of Boerne tests whether a congressional enactment is remedial in nature or whether it "imposes new substantive constitutional

-11-

rights through legislation." Goshtasby v. Board of Trustees, 141 F.3d 761, 769 (7th Cir. 1998). Appellants contend that the rights conferred under the IDEA are new substantive rights and are thus beyond the scope of Congress' power.

In City of Boerne the Court suggested that a bellwether of "congruence" is whether Congress can justify the use of preventative rules by showing that they are appropriate remedial measures. See 117 S. Ct. at 2169. Appropriateness is measured against the severity of the problem to be redressed. See id. The Court will ratify Congress' factual conclusions so long as they do not directly subvert an earlier determination of the boundaries of equal protection. See Oregon v. Mitchell, 400 U.S. at 295-96 (Stewart, J., concurring in part and dissenting in part).

The legislative history establishes that the IDEA is remedial, not substantive, in nature. In support of the EHA, the predecessor statute to the IDEA, Congress explicitly found that "there are more than eight million handicapped children in the United States," that "more than half of the children with disabilities in the United States do not receive appropriate educational services which would enable them to have full equality of opportunity," and that "one million of the children with disabilities in the United States are excluded entirely from the public school system and will not go through the educational process with their peers." 20 U.S.C. § 1400(b)(1), (3), and (4) (1998). Congress perceived "that a majority of handicapped children in the United States "were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" H.R. Rep. No. 94-332, at 2 (1975) quoted in Rowley, 458 U.S. at 179 (internal quotation marks omitted).

The Supreme Court's treatment of the Act's legislative history in Rowley neatly encapsulates the various concerns that informed the Act's passage. See 458 U.S. at 191-97. The House Report emphasized "exclusion and misplacement," and members of the Senate remarked that "'all too often, our handicapped citizens have been denied the opportunity to receive an adequate education'" and "'have been

excluded from the educational opportunities that we give to our other children.'" Id. at 191 & n.13 (quoting 121 Cong. Rec. 19494, 19502, 23708 (1975)). The extensive factual basis adduced from the record and previous judicial decisions establish that the IDEA was intended to remediate very real and valid congressional concerns.

The Supreme Court's assessment of RFRA in City of Boerne provides a striking contrast. In rejecting a challenge by the Archbishop of San Antonio to the City of Boerne's denial of a building permit application, the Court ruled that RFRA was an unconstitutional attempt by Congress to usurp the Court's "'duty to say what the law is'" by altering the applicable legal standard, rather than a measured response to constitutional violations. Id. at 2172 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). The Court emphasized that the facts mustered before Congress simply did not support its determination that the burdening of religious practice was a problem serious enough to warrant restrictive legislation. See 117 S. Ct. at 2169 ("RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry"); cf. Oregon v. Mitchell, 400 U.S. at 130 ("Congress made no legislative findings that the 21-year-old vote requirement was used by the States to disenfranchise voters on account of race.").

In highlighting the paucity of factual support for RFRA, the Court contrasted it with the Voting Rights Act of 1965, legislation at the center of several earlier decisions concerning the extent of Congress' section 5 power. See 117 S. Ct. at 2163, 2170-71; see also South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966) (upholding challenged provisions of Voting Rights Act of 1965); City of Rome v. United States, 446 U.S. 156 (1980) (upholding extension of Voting Rights Act). Despite the fact that the Supreme Court had earlier upheld the constitutionality of practices made illegal by the Voting Rights Act, the Court affirmed Congress' power to pass legislation proscribing those practices on the basis of detailed findings concerning flagrant abuse of voting qualifications. See City of Boerne, 117 S. Ct. at 2170-71(discussing voting rights cases).

By contrast, Congress in passing RFRA was concerned not with interdicting pervasive discrimination against a disfavored group, but rather with "the incidental burdens imposed" by statutes of general applicability. Id. at 2169. In other words, Congress' express purpose–the motivation that the Court found fatal–was to overrule the Supreme Court's decision in Smith and alter its interpretation of substantive constitutional law. The IDEA, on the other hand, represents a scheme designed to "meet the educational needs of children with disabilities in order to assure equal protection of the law." 20 U.S.C. § 1400(b)(9) (1998). Because there is ample support for this finding of educational need, we agree with appellees that the statute is remedial in nature.

Appellants additionally contend that the IDEA offends the notion of congruence because it attempts to "enforce a constitutional right by changing what the right is." Boerne, 117 S. Ct. at 2164. The City of Boerne Court recognized that additional guidance was necessary for determining when a congressional enactment oversteps boundaries inherent in competing separation-of-powers principles. The Court observed that while congressional determinations of "'whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference," 117 S. Ct. at 2172 (quoting Morgan, 384 U.S. at 651), "Congress does not enforce a constitutional right by changing what the right is," id. at 2164. Rather, "[t]he power to interpret the Constitution in a case or controversy remains in the Judiciary." Id. at 2166.

In support of their argument that Congress in passing the IDEA overstepped these boundaries, appellants rely on the syllogism that since equal protection only extends to suspect or quasi-suspect classes and since disabled children are not a suspect or quasi-suspect class under City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985), the equal protection doctrine does not permit passage of legislation, such as the IDEA, that benefits the disabled. The majority of courts to address this argument have concluded that the mere fact of non-suspect status does not preclude Congress from legislating on a group's behalf. See Autio v. AFSCME, Local 3139,

157 F.3d 1141 (8th Cir. 1998) (en banc) (upholding validity of ADA by an evenly divided vote); Kimel v. Florida, 139 F.3d 1426 (11th Cir. 1998) (upholding validity of Americans with Disabilities Act under Fourteenth Amendment); Coolbaugh v. Louisiana, 136 F.3d 430 (5th Cir. 1998) (same); Clark v. California, 123 F.3d 1267 (9th Cir. 1997), cert. denied, 118 S. Ct. 2340 (1998) (same).  But see Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698 (4th Cir. 1999).[6]  While no circuit courts have addressed the issue of whether the IDEA similarly permits abrogation, the two courts to consider the question in light of Seminole Tribe have answered affirmatively, albeit without a detailed analysis of the issue.  See Board of Educ. v. Illinois State Bd. of Educ., 979 F. Supp. 1203, 1208 (N.D. Ill. 1997); Peter v. Johnson, 958 F. Supp. 1383, 1394 (D. Minn. 1997), rev'd on other grounds, 155 F.3d 942 (8th Cir. 1998).[7]

---

[6]Among the eight circuit courts to consider in light of City of Boerne the constitutional propriety of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, a statute that affords equal-rights protections to the aged, also a non-suspect class under the Fourteenth Amendment, six have determined that Congress has the power to abrogate states' Eleventh Amendment immunity.  See Cooper v. New York State Office of Mental Health, 162 F.3d 770 (2nd Cir. 1998); Migneault v. Peck, 158 F.3d 1131 (10th Cir. 1998); Coger v. Board of Regents, 154 F.3d 296 (6th Cir. 1998); Keeton v. University of Nevada Sys., 150 F.3d 1055 (9th Cir. 1998); Scott v. University of Mississippi, 148 F.3d 493 (5th Cir. 1998); Goshtasby, 141 F.3d at 761. 1998).  But see Kimel, 139 F.3d at 1426, cert. granted 119 S.Ct. 901 (1999); Humenansky v. Board of Regents, 152 F.3d 822 (8th Cir. 1998).  Because the statutes at issue in the two cases differ substantially, we do not believe that Humenansky is controlling precedent in this decision.  In any event, the Supreme Court has granted certiorari in the Kimel case and we can thus anticipate further guidance, at least with respect to the ADEA.

[7]Prior to City of Boerne and Seminole Tribe, several circuit courts recognized the IDEA as a valid exercise of Congress' section 5 enforcement power.  See David D. v. Dartmouth Sch. Comm., 775 F.2d 411, 421 n.7 (1st Cir. 1985) (upholding validity of IDEA); Mitten v. Muscogee County Sch. Dist., 877 F.2d 932, 937 (11th Cir. 1989) (same); Counsel v. Dow, 849 F.2d 731 (2nd Cir. 1988) (same); Crawford v. Pittman, 708 F.2d 1028, 1036-37 (5th Cir. 1983) (same). However, the impetus for these earlier challenges to the validity of the IDEA was the Supreme Court's

In our view, these decisions properly apply Supreme Court precedent. We do not read that precedent to suggest that congressional power to enforce the Equal Protection Clause is so circumscribed in scope as to limit Congress' role in protecting individual rights to that of scriveners codifying existing decisions. See Morgan, 384 U.S. at 648-49 ("Such a conclusion 'would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the 'majestic generalities' of § 1 of the Amendment.'") (citations omitted). As the Sixth Circuit recently observed, the "Supreme Court's equal protection jurisprudence is not confined to suspect or quasi-suspect classifications." Coger, 154 F.3d at 305. The Court has applied equal protection analysis and struck down state statutes where neither a fundamental right nor a suspect class was involved. See, e.g., City of Cleburne, 473 U.S. at 450 (invalidating a permit denial on rational basis review); Romer v. Evans, 116 S. Ct. 1620, 1627 (1996) ("By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."). Seventh Circuit Chief Judge Richard Posner has explained that the scope of congressional power turns not on whether a classification is subject to heightened judicial scrutiny, but on whether, at least sometimes, state action based on such a classification results in unconstitutional conduct. See Velasquez v. Frapwell, 160 F.3d 389, 391-92 (7th Cir. 1998). Judge Posner observed that "[b]ecause the aged [and disabled] are not as vulnerable as certain other groups, such as blacks, they are not entitled to have their claims of discrimination evaluated under the generous (to plaintiffs) standard of 'strict scrutiny.'" Id. at 392. Nonetheless, in "City of Cleburne . . . the Supreme Court . . . invalidated the denial of a permit for a home for mentally retarded persons as

---

statement in Pennhurst that "we 'should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment.'" Counsel, 849 F.2d at 737 (quoting 451 U.S. at 16). Thus, these decisions only reached the question of whether Congress intended to pass the legislation pursuant to its section 5 powers, not whether it had the constitutional authority to do so.

founded on 'irrational prejudice against the mentally retarded.'" Id. (quoting 473 U.S. at 450).[8]

The notion that the IDEA must fail as a valid exercise of Congress' Fourteenth Amendment power because physical[9] and mental disability is not a suspect classification misconstrues not only the purpose of suspect classifications, but also the very nature of judicial scrutiny. The Court has observed that judicial standards of review in equal protection cases were developed "absent controlling congressional

---

[8]Had the Court intended City of Boerne to stand for the proposition that Congress' section 5 power is limited to protecting only those classes of individuals entitled to heightened levels of judicial scrutiny, it seems odd that its discussion would highlight South Carolina v. Katzenbach, a decision that upheld the suspension of literacy tests despite an earlier ruling validating such tests as constitutional. See 117 S. Ct. at 2163 (citing 383 U.S. 301, 308 (1966)). Similarly, it is worth noting that at the time of the unanimous decision in Fitzpatrick v. Bitzer, 427 U.S. at 445, permitting Congress to abrogate state immunity pursuant to the 1972 Amendments to Title VII of the Civil Rights Act of 1964, which subjected state governments to liability for discriminating in employment on the basis of race, color, religion, sex, or national origin, it was not at all clear that gender was subject to a heightened level of scrutiny. Compare Craig v. Boren, 429 U.S. 190 (1976) (applying "intermediate" scrutiny to gender claims in a case decided six months after Fitzpatrick) with Stanton v. Stanton, 421 U.S. 7, 13, 17 (1975) (striking statute under either rational basis or strict scrutiny on Equal Protection claim). It is evident from these decisions that the Supreme Court permits Congress to pass legislation under the Fourteenth Amendment even though the state action proscribed by the legislative enactment would not itself constitute a violation of Equal Protection. See also Fitzpatrick, 427 U.S. at 458 (Stevens, J., concurring) (stating that the plaintiffs had not "proved a violation of the Fourteenth Amendment").

[9]Though the Court in City of Cleburne was only faced with the issue of whether mentally handicapped individuals represented a suspect classification, the Court included the physically handicapped among other groups that it apparently considered not to warrant heightened scrutiny due to an absence of continuing antipathy or prejudice. 473 U.S. at 445-46. Thus, it seems likely that disability in general is not a suspect classification.

direction." City of Cleburne, 473 U.S. at 439. Unless a claim involves a suspect classification, courts generally assume the validity of legislation due to the deference accorded to legislative judgment. See, e.g., id. at 441-42 (discussing judicial reluctance closely to scrutinize legislative choices as to whether, how, and to what extent interests should be pursued). Congress' fact-finding role gives it a unique opportunity to scrutinize problems that come to its attention and prohibit constitutional violations even where the rational basis test would hinder a court's ability to discover a violation. See id. at 442-43 ("How [the disabled are] to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary."). Thus, Congress is not limited to legislating on behalf of groups identified as suspect for purposes of judicial review. To hold otherwise would be to confuse a level of judicial scrutiny with the scope of congressional power.

Applying the analysis outlined above, it is evident that the IDEA is congruent with the dictates of equal protection law. The Supreme Court has defined the Equal Protection Clause to provide the disabled with protection against arbitrary and invidious discrimination[10] and Congress is entitled to enforce those protections

---

[10]Appellants insist that Congress is not free to determine what constitutes "invidious" discrimination absent judicial pronouncement on the issue. This merely restates the issue. In order to run afoul of the Equal Protection Clause, discrimination must be intentional and arbitrary or invidious. See Washington v. Davis, 426 U.S. 229, 248 (1976) (holding that government action that unintentionally harms one group more than another does not offend the Equal Protection Clause); Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352 (1918) ("The purpose of the equal protection clause of the 14th Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination . . . ."); City of Cleburne, 473 U.S. at 446 ("Our refusal to recognize the retarded as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination. . . . The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). As appellees' note, the term "invidious" merely means offensive discrimination and is synonymous with the term "discrimination" in its pejorative sense. (See Appellees' Brief at 17.) This usage

through preventative legislation.  See City of Cleburne, 473 U.S. at 446-47, 450. Moreover, because the legislation neither affects a substantive change in equal protection analysis nor attempts to implement protective legislation absent a factual basis, it is an appropriate remedial measure.

2.  Proportionality

The second part of the City of Boerne test examines whether the reach of the enactment is so out of proportion with the harm sought to be remedied that the Act becomes substantive in operation and effect.  See Goshtasby, 141 F.3d at 771; Coolbaugh, 136 F.3d at 435.  We conclude that the IDEA is not "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior."  City of Boerne, 117 S. Ct. at 2170.

Keeping in mind the deference accorded to Congress in line drawing, it is clear that the IDEA satisfies the proportionality requirement.  See id. at 637 (stating that even some constitutional conduct may be swept up in the ambit of Congress' enforcement power); see also Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 314 (1976) ("[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one.").  Congressional determinations that discriminatory treatment is directed at a class of persons are part of an ongoing

---

resonates with the Court's opinion in City of Cleburne, which established that intentional, invidious discrimination will not pass rational-basis review. See 473 U.S. at 446-47.  Thus, it is no argument to state that it may be difficult to say what is "invidious."  The Court answered this question in City of Cleburne when it noted that discrimination aimed at identifiable groups because of negative and unfounded stereotypes is arbitrary and invidious–i.e. offensive–absent some legitimate governmental interest supporting the distinction.  See id. at 448-49.  Based on the testimony and evidence before it, Congress concluded that precisely this type of discrimination was aimed at disabled students and sought to remediate that problem by passing the IDEA.

-19-

conversation concerning the substantive meaning of section 1. See City of Boerne, 117 S. Ct. at 2166-67; see also South Carolina v. Katzenbach, 383 U.S. at 308 ("The constitutional propriety of [legislation adopted under the Enforcement Clause] must be judged with reference to the historical experience . . . it reflects."). As noted above, the Supreme Court in City of Cleburne determined that the disabled are protected from arbitrary and invidious discrimination. The passage of federal legislation designed to protect the disabled in the intervening years since the City of Cleburne decision reflects an increasing societal intolerance for discrimination based not on legitimate differences in mental and physical ability, but rather on the fear of difference. For example, Congress in 1990 passed the ADA, 42 U.S.C. §§12,101-213 (1998), essentially extending the Rehabilitation Act of 1973, 29 U.S.C. §§ 701- 796l (1998), which applies only to programs receiving federal assistance, to the entire economy. See Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 484-86 (7th Cir. 1997) (Posner, C.J.) (discussing legislative history and societal context of ADA in holding act applies to state prisoners).

In City of Boerne, the Supreme Court found RFRA to violate the proportionality requirement because "[s]weeping coverage ensures its intrusion at every level of government." Moreover, the "substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional regulatory power, far exceed any pattern or practice of unconstitutional conduct." Id. at 2171. The IDEA could not be more different. Unlike the ADA or ADEA, it is entirely voluntary on the part of the states. In order to remediate exclusion of the disabled from public education, Congress has given the states an inducement to adopt its legislative scheme. So long as the states follow the procedures set forth in the legislation, there is no litigation burden. And the states are free to reject federal aid and adopt their own plan for educating the disabled. Accordingly, we cannot say that the scope of the IDEA is out of proportion to its remedial objective.

Similar considerations animate a distinct aspect of the proportionality argument against the power of Congress to pass the IDEA under the Fourteenth Amendment: its purported intrusiveness upon the states. Though attenuated, federalism principles are not entirely absent when Congress acts pursuant to its section 5 powers. See Gregory v. Ashcroft, 501 U.S. 452, 468 (1991). The Supreme Court's disapproval of RFRA, for example, was based in part upon that statute's "considerable congressional intrusion into the States' traditional prerogatives." 117 S. Ct. at 2171. Some courts have relied on this aspect of City of Boerne in striking legislation designed to promote the interests of the disabled in greater participatory access to larger society. See Brown, 166 F.3d at 704-06 (striking regulation promulgated under Americans with Disabilities Act as beyond section 5 powers). Federalism concerns, whatever their force with respect to the Americans with Disabilities Act, simply do not bear upon the IDEA, a statute frequently described as a model of "cooperative federalism." See, e.g., Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 151 (3d Cir.1994); Town of Burlington v. Department of Educ., 736 F.2d 773, 783-84 (1st Cir.1984). Congress' intention in enacting the IDEA "was not that the Act displace the primacy of the States in the field of education, but that States receive funds to assist them in extending their educational systems to the handicapped." Rowley, 458 U.S. at 208. Since the Act authorizes federal funding contingent upon state compliance with its array of substantive and procedural requirements, the legislative scheme functions as a contract between equals. See 20 U.S.C. § 1412 (1998). A state is entirely "free to accept or reject the participation of the federal government in its educational programs for the disabled." See Burlington, 736 F.2d at 784. If a state does choose to participate, authority is vested in state and local bodies to effectuate the legislation's substantive and procedural guarantees. See id. In fact, the statutory scheme "allows some substantive differentiation among the states in the determination of which educational theories, practices, and approaches will be utilized for educating disabled children with a given impairment." Id. (citing Rowley, 458 U.S. at 207-08). The statutory architecture thus relieves any fears that the IDEA implicates the same concerns that animated the Boerne Court's discussion regarding the litigation costs imposed on the states by RFRA. See 117 S. Ct. at 2171. Rather,

the legislation imposes a threshold level of legally enforceable obligations on states who voluntarily submit to the scheme in exchange for substantial monetary aid for education programs.

Because we hold that the IDEA is a proper exercise of Congress' section 5 enforcement power under the Fourteenth Amendment, we conclude Congress successfully abrogated appellants' Eleventh Amendment immunity from suit. We therefore affirm the district court's denial of the motion for summary judgment.

C. Implied Waiver

The Mauneys also assert that § 1403 of the IDEA "manifest[s] a clear intent [on the part of Congress] to condition participation in the programs funded under the Act on a state's consent to waive its constitutional immunity." Atascadero, 473 U.S. at 247. Because we hold that the Act is valid as an exercise of Congress' Fourteenth Amendment power, we consider the question of whether appellants impliedly waived immunity only in the alternative.[11]

The doctrine of waiver supplies the other "well-established" exception to Eleventh Amendment immunity. See id. at 238. Congress may condition the receipt of federal funds on a waiver of Eleventh Amendment immunity only when the statute provides unequivocal notice of this condition. See id. at 247. That is, "the mere

---

[11]Appellants contend that because the IDEA is a proper exercise of Congress' power under the Spending Clause, it cannot as well be plainly adapted to enforcing the Fourteenth Amendment. However, Congress does not have to correctly surmise the source of its authority in order to pass legislation, and may ground its legislative authority in multiple sources. See Crawford v. Davis, 109 F.3d 1281, 1283 (8th Cir. 1997); Coger, 154 F.3d at 303. We also "recognize the 'constitutional difficulties' with imposing affirmative obligations on the States pursuant to the spending power," Pennhurst, 451 U.S. at 17 n.13, but note again that the IDEA is wholly voluntary in nature.

receipt of federal funds cannot establish that a State has consented to suit in federal court." Id. at 246-47. Rather, the existence of a waiver must appear "by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." Id. at 239-40 (internal quotation marks omitted); see also Pennhurst, 451 U.S. at 17 ("By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.").

No court has squarely considered the question of whether § 1403 of the IDEA constitutes a waiver. However, the Supreme Court characterized a parallel provision in the Rehabilitation Act as "an unambiguous waiver of the States' Eleventh Amendment immunity." Lane v. Pena, 116 S. Ct. 2092, 2100 (1996).[12] Relying on this characterization, the Ninth Circuit ruled that § 2000d-7(a)(1) "manifests a clear intent to condition a state's participation on its consent to waive its Eleventh Amendment immunity." Clark v. California, 123 F.3d 1267, 1271 (9th Cir. 1997), cert. denied, 118 S. Ct. 2340 (1998).

Additional support for this position is found in a Seventh Circuit discussion of the issue. See Marie O. v. Edgar, 131 F.3d 610, 617-18 (7th Cir. 1997). Because it disposed of the case on other grounds, the Seventh Circuit did not decide the question. See id. at 617.[13] However, the panel indicated that it viewed § 1403 (a) as

---

[12]The language of the waiver provision contained in the Rehabilitation Act tracks precisely with that in § 1403 of the IDEA. Compare 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of section 504 of the Rehabilitation Act of 1973.") with 20 U.S.C. § 1403(a) (1994) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this chapter.").

[13]The Seventh Circuit decided the issue under the Ex Parte Young doctrine. See 209 U.S. 123, 159-60 (1908). Neither party raised the issue in this case, so we do not address the issue. We note, however, that Ex Parte Young provides an equally acceptable basis for upholding the validity of prospective relief sought under the

effectuating a waiver of states' immunity. See id. at 617-18 (noting that while the section does not use the terms "waiver" or "abrogation," the purpose of subjecting the states to suit in federal court is evident from the provision's language).

The court expressed, however, some unease with this interpretation. Congress used the term "abrogation" in the heading of § 1403(a), captioned "Abrogation of State sovereign immunity." Id. at 617 (quoting 20 U.S.C. § 1403). The Seventh Circuit, apparently assuming that Congress could no longer use the IDEA as a vehicle to abrogate states' immunity, resolved the seeming contradiction by asserting that Congress, in failing to change the caption after Seminole Tribe, must have meant the term to be read as "waiver." See id. at 618 (stating that "'Congress expects its statutes to be read in conformity with [the Supreme] Court's precedents.'" (quoting United States v. Wells, 117 S. Ct. 921, 929 (1997)).

We find more persuasive the reasoning of the Supreme Court and the Ninth Circuit, and would thus characterize § 1403 as "an unambiguous waiver of the States' Eleventh Amendment immunity." Lane, 116 S. Ct. at 2100; see also Minnesota Transp. & Regulation Bd. v. United States, 966 F.2d 335, 339 (8th Cir. 1992) (stating that section titles cannot limit the plain meaning of the text). However, we join the Seventh Circuit in noting that the problem is "a regrettable one," and urging "that the appropriate legislative steps be taken to achieve the clarity necessary to ensure effective governance." Marie O., 131 F.3d at 618.

### III. Conclusion

The case is remanded to the district court for further proceedings consistent with this opinion.

WOLLMAN, Chief Judge, concurring and dissenting.

---

IDEA.

I agree with the court that Congress unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity to suit under the IDEA.

For the reasons expressed by our court in Humenansky v. Regents of Univ. of Minn., 152 F.3d 822 (8th Cir. 1998), and by the Court of Appeals for the Fourth Circuit in Brown v. North Carolina Div. of Motor Vehicles, 166 F.3d 698 (4th Cir. 1999), I do not believe that Congress has the power to abrograte that immunity under section 5. The Supreme Court may soon set forth with greater specificity the extent of Congress's power to abrogate Eleventh Amendment immunity under section 5 than that expressed in City of Boerne. See Kimel v. Florida Bd. of Regents, 139 F.3d 1426 (11th Cir. 1998), cert. granted, 119 S.Ct. 901, 902 (1999). Until the Court has done so, however, I would adhere to the interpretation of City of Boerne expressed in Humenansky and Brown.

Accordingly, I dissent from that portion of the court's opinion which holds that Congress acted within its section 5 powers by abrogating the states' Eleventh Amendment immunity to suit under the provisions of the IDEA.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.